May it please the court. Christina Shindley on behalf of the Idaho Department of Correction, Director Bree Derrick. I would like to reserve three minutes for rebuttal. The district court granted unprecedented access to execution steps, personnel and places when it issued a preliminary injunction restraining the department from carrying out any lethal injection execution unless IDOC grants access to all tasks associated with the preparation and administration of the lethal injection drugs. Well, first of all, my understanding is that what he granted or and if this isn't clear, I think we can make it clear. Only began from the time that the. And it was taken out and put in the two rooms where he was treated, I gathered, but the first of those rooms, nothing before that. You know, the plain language of the injunction says all tasks associated with the well, that's my understanding. And we can let's assume that if that's not the case, that we would make it the case. So let's presume that that's what we're talking about. Thank you, Your Honor. The injunction, even as limited by the court's interpretation, it's still far exceeds what the First Amendment grants as access to an execution process. It is overly broad and it fails to comply with the Prison Litigation Reform Act. IDOC submits that the execution protocol in place already satisfies the right of access that this circuit has recognized. This circuit has three cases that establish the right of access to execution processes, specifically. Let me just understand the particular context here. Are the steps that are at issue in the medical preparation room, are they steps that are taken after the defendant has entered the execution chamber? Yes, Your Honor. The process that Idaho Department of Correction undertakes is as follows. The condemned individual is placed onto a medical grade gurney, is taken to the execution preparation room. At that point, the IV ports are then inserted. While that is visible to all of the witnesses in the witness rooms. And just to interrupt for a minute, by the medical team, the same medical team that's later in the other room. Some of the medical team members do insert the IV catheters, yes, Your Honor. And they are dressed in scrubs and stuff. Yes, Your Honor, they're in scrubs, they have masks, and they have caps. Okay, go ahead. Then why doesn't this fall within the clear language of our holding in Woodford that the public enjoys a First Amendment right to view executions from the moment the condemned is escorted into the execution chamber, which you said this is after. Including those initial procedures that are inextricably intertwined with the process of putting the condemned inmate to death. Aren't these inextricably intertwined with that process? Your Honor, these particular acts are the acts that are participated and are conducted by the executioner, rather than the events that occur in the execution chamber. Woodford- Stop what that sentence says. Woodford specifically said that the events are once the condemned individual enters the chamber and is attached to the mechanism of death. And so the Idaho Department of Correction has assured that those events are in fact observed. Do you think it would be consistent with Woodford if you had the chamber and then you put a divider in the chamber and then put all the people involved in the execution on the other side of the divider? And so the public would only see the defendant on the gurney receiving it. In your view, that would then be consistent with what we've said in our prior cases? Yes, Your Honor. Woodford, Ryan, and Otter all say that the acts that are subject to public access and which would be the press's access in this- All the personnel involved could be put behind a screen and just have the defendant out with tubes, and no one sees anyone else involved. The department submits that Woodford's precedent would require- That's exactly what's happening here, right? I mean, it's not a barrier, it's a room, but it's essentially, it's a wall. Correct, once the condemned individual is connected with the apparatus of death, then the team vacates the execution chamber, and then they do monitor the lines themselves. But the administration of the chemical is conducted from a screened room. I particularly- Just back to Judge Collins' question. The magistrate judge understood Woodford not to apply to this case. Meaning, she did not consider herself bound by Woodford. She extended Woodford in order to reach the conclusion that she did. Yes, she explicitly found that twice in her order. It's at the two excerpt of records, pages 127 and 130, where the district court specifically said that she was extending Woodford. That Woodford, Ryan, and Otter did not mandate her preliminary injunction. She found that it was an extension of Woodford. And the department respectfully submits that that extension is not required under the First Amendment and violates the PLRA. With respect to the extension of Woodford, the test on what access, if any, is granted under the First Amendment. There are two tests. This circuit has determined that the appropriate test is the experience and logic test set out in Press Enterprise. And that those two prongs include the experience prong, which is, is there a historical basis for believing that the place and process has been accessible to the public? So how do we analyze that? Because, I mean, it is sort of, it depends on what we are looking at as the place. Because if it is the place of execution, would you agree that there is a historical precedent for allowing the place of execution to be publicly accessible? There is a historical basis for believing that there has been limited access granted by either the legislatures or the executives who are carrying out an execution. There's been limited access to the place and the condemned. Is this an open question? Wasn't that resolved by Woodford and his progeny? So that, to the extent that Woodford finds a limited right under the First Amendment, the department does submit that it conflicts with Calderon, which was the earlier case. But to the extent- But how can, I mean, that's a very big part of your brief and I don't understand it. Because Woodford said specifically that we're bound by Calderon. And Calderon remanded to do exactly what the district court in the appeal that resulted in Woodford did. And the Court of Appeals opinion recognizes and applies the standard, the exaggerated standard from Calderon. So how could there be a conflict? In Calderon, that panel in Calderon found that the California policy, which allowed access to the chamber and the condemned at the time of entry until death was sufficient to satisfy First Amendment. And then it said, after it said that, it's confusing. But after it said that, it said, and we're remanding for, essentially, it seemed to be finding that there wasn't summary judgment on the record. And then it said what the standard was, and that was the standard that wasn't applied in Woodford, so they're completely consistent. Looking at the district court opinion on remand, the district court specifically acknowledged that it had some limiting law issued by the Ninth Circuit in Calderon. And then said, respectfully, I'm going to hold an evidentiary hearing, and I'm going to apply the facts to the standard. He was told to hold an evidentiary hearing. Your Honor, he was, the district court on remand was to determine whether or not- Anyway, I don't think it's your strongest argument. Let's put it that way. Thank you, Your Honor. Thank you, Your Honor. Even considering that Woodford is good law, as this panel could be, likely would find and would apply, under Woodford, the department's execution protocol, meets the standards. There's no reason, and in fact, there's no legal basis for extending the holding in Woodford, which says that the public, as represented by the press, has a right to observe the condemned in the place of execution and attach the apparatus of death. And that's exactly what the department provides. From the moment that the condemned is placed on the gurney, is taken to the preparation room, has the IV insertion done, and then is transported to the execution chamber, and is connected to the IV tubing. Aside from the preparation stuff, what they don't see is the transmission of the chemical to the individual. They don't- The step that is not- It's going through a wall, and that's a little bit artificial. Usually, I can't think of any other instance in which people's IVs are communicated through walls. Your Honor, the one item, the action that is not observed, is the pressure on the plunger that then puts the chemical into the tubing. And then the tubing is itself visible, and the effect on the condemned is visible. Well, some of the tubing is visible. The tubing connected to the condemned is visible, Your Honor. From the wall forward, but not from the wall back. Yes. The tubing is visible up to the wall, and then what occurs in the chemical room is not visible to the press or to the public. And under the Press Enterprise 2 test, there's no reason to extend Woodford to include visibility or access to the executioner. The historical analysis would demonstrate that there has been, since the early to mid-1800s, execution states have been closing their executions. Our brief addresses that in pages 43 and 44, footnotes 9 through 41, identifies all of those state statutes that have closed executions to or from the public. Instead, they were moved inside or indoors or behind closed walls, and Idaho is no different than any of the other states. In 1899, when Idaho, in its first statutes related, after it gained statehood, at that point, it went from a sheriff and a local execution process to a state and a prison-based execution process, at which point the public was excluded. All of those executions occurred behind closed walls or in a building. And the only access that was granted was as set out by the legislature or by the wardens. In other words- Again, I don't understand why Woodford didn't resolve this on a nationwide basis, not an Idaho-specific basis, the history, the relevance of the history. Why are we going back over it? In Woodford, the circuit specifically determined that under the historical analysis of press enterprise, that the historical access was to the mechanism of death and the condemned, not the executioner. That it was from the moment that the condemned entered, whether it was the gallows, where the gallows could be secreted and hidden from public view. Whether it was the execution, the electric chair, whether it was a room where there was a gallows, that in all of that historical analysis, the court in Woodford specifically found that the access was to the condemned and the mechanism of death, not to the executioner. And this particular injunction extends that access to the executioner and a place that the condemned never enters. And that is the extension that has been ordered by the district court and that exceeds the authority and the requirement as set forth in Woodford, Ryan, and Otter. In addition, the other part of the press enterprise test is the logic prong. And that is whether the access would play a positive role in the functioning of government. And the department respectfully submits that it would not under these circumstances. And there's a specific reason why. In the injunction, to the extent that if it is limited to just viewing the plunger and placing the chemical into the tubing, the only thing that would be gained is the plunger. In other words, this is a chemical that is clear. There is no way to observe what happens to that chemical once it enters the tubing until it reaches the body of the condemned. So what- For example, when you put the chemical in, there was a leakage at that edge, you could see that. You could see the chemical entering. Potentially, you might see a leakage. It is a clear fluid. It's arguable whether or not that would be visible. But what would be visible is the impact on the condemned person and their body, which is the access that has been granted in Woodford, Ryan, and Otter. And nothing in that chemical room is anything that would provide any additional information. To the extent that there's a need to know when chemical is pushed, then that can be done. And it is going to be done by the department, by a light and verbal authorization or confirmation by the warden. That that is a system that if it's the actual administration of the chemical, meaning when is it administered? How many doses are administered? Could you just switch gears a little bit, because you're running low on time, and talk about what the governmental interests are in proceeding in this very weird fashion? The governmental interest in- In proceeding this way and having a separate room and having the IV come through a wall, so you can see part of the tube, but not the other part of the tube. And what is the interest in doing it this way? The interest is in controlling access to all of the rooms. That particular chemical room also contains all of the supplies and all of the other items. There's no access. No one's going to go see anything. And the cameras doesn't have to look at the whole room. It just looks at whatever's being done. That's part of the execution. And the department respectfully submits that the injunction is much broader than that and must be reversed. If this court were to determine that an alternative is that it should be limited, then at the most, that should be what is granted. The department submits that this injunction is incompetent. In what ways, it may be, I mean, I think it's clear that he meant the preparations he was talking about were the preparations after the guy got to the first room. But if that's not clear, we can make it clearer. What else was not clear? It's not clear to the extent that if the access has to be to the entirety of the chemical preparation room, I'm sorry, the medical preparation room, meaning all of the medical team and what they're doing. He never said that. The injunction doesn't say that. OK, the department understands the court's limiting on that injunction. The injunction on its face does include that. You might get some of what you want. As it currently states. But let's ask that. I mean, I think what Judge Berzon is asking is, are you concerned if it were so narrowed that it was only the tubes, I guess. And what was being put in the tubes. Yeah. Do you still have the concern? The department still does have the concern because the department respectfully submits there's no First Amendment right of access to the information that's being ordered. Because of that or because of the potential of disclosing medical examiners? So we would start with no right. And then if there is a right, the department would submit that there are legitimate reasons, valid penological interest for why that should not be accessible. What the order says is that the motion is granted insofar as defendant must provide execution witnesses with audio and visual access to the preparation and administration of the lethal injection drugs. That seems to give you some discretion about how to aim the camera to stay within just what the district court required and not to include things the district court didn't require. So is that tailoring built in already? The tailoring is not built into the injunction. That is an overly broad injunction because it does not limit in time or scope what must be made available and accessible to the press and the public. What do you mean in time? So preparation in starts the day before when it comes to the chemicals. No, no, no, but Woodford, the right recognized in Woodford and even as extended here is a right from the moment the defendant enters the execution chamber. That was my first question to you was what are the processes we were talking about here take place after that moment? So I don't read anything in the order as saying you need to give any access prior to the moment the defendant enters the chamber. Thank you, Your Honor. And with that caveat, there are still concerns about whether or not there's an ax. There's right of access to the executioner in the place of execution outside of the place where the condemned is. All right, but so what exactly is the interest? Is it an interest in anonymity or a concern for the safety of the executioners? Correct, so the- But two things about that. One is that at least some of them are already being seen at the beginning, right? Some of them, yes. Right, okay. So it's not a very strong interest. Second of all, when they are seen at the beginning, they're in scrubs and masks and stuff, and they can do the same thing in the medical room, right? With respect to the garb that can be worn, the clothing. Yes, Your Honor. All right, so what's the problem? The problem is currently the medical team operates silently. So when they're in the medical preparation room, the execution preparation room and the execution chamber, they are communicating silently. They are moving around except for the medical team leader. He's the only one that makes any audible sounds. Everybody else on the team operates silently. In the chemical preparation, I'm sorry, in the medical team room, they don't currently have that limitation because they are not- Well, they don't currently have it, but they could have it. And then they would be unable to communicate with the team leader and with the warden and with the director. And so if there were issues that they found in the medical team room, they would not be able to communicate that. And the reason you want them to be silent is because somebody might recognize their voice? Yes, Your Honor. That there would be, there's anonymity issues with respect to their voices. And the department has concerns about that. So what are the kinds of issues that might arise that they might need to communicate? So the protocol itself sets out what happens if there is something that is located or something that's noticed about the syringes themselves. So when the chemical is drawn, if there's an issue with that, they would communicate that to the warden and then they would engage- So what about at the other end, when they're in the room with the person and they're putting IV in his arm, certainly issues could arise. And that would be, again, the cameras are focused on the condemned and on the actions that are occurring with the body of the individual. Okay, but what about the somewhat ephemeral communication issue? And then, so they're communicating with each other silently. So they're not having to communicate with individuals in a different place. So on the last, because as I understand it, the last execution in Idaho, they weren't able to find a vein, correct? That is correct. For injection. Was that being observed by the press at the time that was happening?  So at that time, we didn't have, the department did not have a separate preparation room. Oh, so the same thing happened now that nobody would see it, even though it was a central part of what they should have seen if they were going to see the whole execution. No, they would see it. We have a separate execution preparation room where it is accessible by camera and audio access. So what happens during the IV insertion is visible and audio. But that's the condemned is being monitored. In other words, the condemned's voice can be heard. Other communications. But that would, hold on, that wouldn't happen in the medical room. That would happen in the room where he was. I mean, the insertion of the IV would happen in his room. You can't do that in a different room. Well, that's what she's saying. So the insertion does happen in a camera room. So we have a separate sterile suite that the department created, and they did that in case there was a need for a central line. So we have a separate room and then the individual is transported. It's all in this. Oh, hold on. So the IV is inserted in a separate room. So there's three rooms. It's inserted in the second room. And then after the insertion, then he comes into the execution room. Yes. And then once he is visible in that second room. Yes. Both the preparation room and the execution unit are fully visible, one by camera, one through a window interplay. The only room that is not accessible is the medical is the medical team room where the chemical is pushed. And that's the event that occurs aside from other team issues. And I'm well over my time. Well, we've taken you over, but we'll give you some time for rebuttal. Thank you. I appreciate it.  Fayette, please, the court, your honors. My name is Wendy Olson, and I represent the appellees in this case, the Associated Press, the McClatchy Company, which does business in Idaho, is the Idaho statesman and East Idaho news does dot com. These media organizations seek their First Amendment right of access, which they do as surrogates for the public to portions of the Idaho lethal injection execution process that are not currently open and that are inextricably intertwined with execution of the condemned individual. Specifically, they seek the audio and visual access that Judge Grasham granted below to the medical team room where, under current protocols, the lethal injection drugs are administered to the condemned individual. That this process currently happens behind closed doors. Well, it's where the path of the drug starts, but where they're actually administered, they do come in the room through the tube. And at that point where they're actually administered, everyone gets to see that. That's correct, your honor. But when they are, when the as as my colleague acknowledged, when the plunger is plunged. So when the process starts, that happens in an entirely different room. And as Judge Grasham herself said in her order, the court struggles to think of a more vital step of the execution process than the actions taken by the medical team room. Well, excuse me, by the medical team while in the medical team room, because without such such actions, the execution watching hanging, you have to see the person who pulls the lever. They couldn't put that behind a screen. I don't think so, your honor. And I think historically, I mean, you see the floor drop and the defendant, you get to observe everything that happens. You get to observe his condition, whether he suffers, whether there's complications. Why do you need to see the person who pushes the button, pulls the lever? Because that's the point at which the execution begins. And there might be complications with initiating and using that mechanism to initiate. But there might be complications even before that. I mean, that can't be the basis. They could mix the wrong drugs before they put it in. You would agree you don't have access to that for drugs that are mixed hours before they're inserted into the even into the plunger area. Yeah, I would agree, your honor. I think that I would posit that as a slightly different comparison. So it would be, and as has happened, if there are more drugs administered than are necessary. Or worse, less drugs than are necessary, which has also happened. Yes. And I think in Ms. Boone's declaration, which Judge Grasham had in front of her when she made her findings on this issue and decided that these processes were inextricably intertwined. There was a execution in Texas where the attorney general came out later and said, yep, we think there was too many drugs administered. And then there was a similar incident in Arizona where there was reporting on that. And so my hypothetical of a leak, if there were a leak in the tube before it got to the hole in the wall, presumably there would be less administered than was intended to be. Correct. And I think, your honor, going back to Judge Collins's initial question about the lever for the to pull the gallows, to pull the trapdoor, rather. If there, you know, if the mechanism, if that mechanism wasn't working and there had to be some extra, you know, pull the lever and it came off. Yes. And I think that lever cracked. That initiation of the execution, I think, isn't, we take the position is inextricably intertwined part of the process. But my pushback is, I mean, this whole inextricably intertwined language is problematic in and of itself, because as this colloquy is just demonstrating, it doesn't provide the full answer here. Because the mixture, you know, of I mean, let's go back months before where they get the drugs is also inextricably intertwined. I mean, there might be two different producers, you know, one of which is more credible than the other in actually giving efficacious medications. So, I mean, once you say inextricably intertwined, that doesn't seem to provide a backstop. And so why is your backstop the one that we should accept as opposed to further back further in the process? And I think that goes to the question that Judge Collins asked of my colleague initially. And that is that Woodford, I think, sets out that this ability to have First Amendment access to an execution begins from the time the condemned is executed into the chamber. Well, so you disagree with the magistrate judge here because the magistrate judge said Woodford did not control this situation. You disagree with that and you think we are bound by Woodford if we apply it to rule in your favor. I think that Judge Grasham found that Woodford does apply. I think what she said was that there had not yet been a case that Woodford was controlling law. It's it sets out. No, no. This is what she said. There is currently no binding precedent explicitly providing general audio and visual access to the medical team room. I mean, she said Woodford does not control this case. Now, she had not she extended Woodford. Your Honor, I guess I would I think that phrasing is comes later in her opinion. She starts out looking at Woodford. What difference does this make? I mean, this is a legal question. And if she looked at Woodford in a more limited way, I mean, Woodford says that the public enjoys a First Amendment right to executions from the moment the condemned is escorted into the execution chamber, including those initial procedures that are inextricably intertwined with the process of putting the condemned inmate to death. Now, I tend to agree with Judge Nelson that inextricably intertwined is terrible language. It's used all over the place and it's always muddies up the situation. And here it's not a question of being intertwined. It's a straight line process that if you don't do this, you can't have that. So it's not a question of being somehow mushed up in it. It's actually what's causing the execution. Then so if there's any there may be other things that are somehow to the side, but this is not to the side. It's right in the middle. And I think, Your Honor, I think Judge Grasham absolutely recognized that Woodford was the governing law. But what she also recognized. But one question in Calderon, we did say that whatever First Amendment right might exist to view executions, the right is severely limited. And then it adopted what is essentially the Turner versus Safley standard. And we acknowledge in the subsequent Woodford that the standard is Turner. But Turner is essentially rational basis, very deferential. And that does not seem to be what the district court here did. It doesn't seem very deferential or rational basis. It seems like least restrictive means. Respectfully, Your Honor, I disagree. I think the court obviously used the Turner test and it looks to what were the legitimate penological interests that the state asserted and the state asserted the anonymity and safety of the medical team members, as well as secondly, the cost of any renovations. And then the court analyzed that and the court said that this question about anonymity and safety really was already addressed by the Ninth Circuit in Woodford and then again by the Ninth Circuit in Otter. And in Otter, the Ninth Circuit was very pointed to the state of Idaho and said, look, you have given us nothing but speculation about why there would be any concern. She seemed to require an affirmative evidentiary showing of the sort that, you know, is more typical of intermediate scrutiny rather than Turner. I think what she required is that it not just be speculation and to use that term a couple of times. And I think she did that because that's what the court said in Otter. A rational basis test would normally say, well, what might reasonably occur? And, you know, is that related to a legitimate interest? We don't require affirmative proof. And that just got labeled as speculation. And it changes the Turner standard. That's my concern. I think it also, Your Honor, she turned to what is, I guess it's truly the fourth part of the Turner standard, and that's whether it's an exaggerated response. And what she went through, part of the analysis that Judge Berzon went through on the people who are in the medical. Turner makes very clear that that is not meant to be least restrictive means. I absolutely agree, Your Honor. And I don't think that I don't think that the court applied a least restrictive means test here. It said, look, this is this this concern that you've asserted here. This is not a least restrictive alternative test. I'm reading from from Turner. Prison officials do not have to set up and shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. But did she follow that here? I think she did, Your Honor, for two reasons. One, she went back to Woodford and Otter and said, look, this this legitimate this interest that you're asserting, we've already considered and rejected it in Woodford and Otter. And that was all the evidence that was before her at that stage. There was evidence in the record from Ms. Boone's declaration. It is a single paragraph. I think it's paragraph 13. But she says and she had she had attended two prior executions and was there for the failed execution of Mr. Creech, who's the Associated Press reporter. And she said, I have never been able to tell who the people are in the medical garb. And she described what they had on. So they appear in the in the execution chamber and in the execution preparation room in this garb, and no one has been able to identify them. So insisting then that in addition to that, they have to put up these walls where they can't be seen. Shows that what they're doing is an exaggerated response. But I don't know that that's right. I mean, if we're going to look to a history analysis, it seems that that I mean, the history of executioners was closely guarded. Secret, like, I mean, very see. I mean, these these people were ostracized in the communities and it often passed from, you know, through a hereditary process because it couldn't no one else would do this stuff because they and that's why they were always protected. So, I mean, I don't I'm not sure what your argument is. You're not denying that the state's interest is legitimate in protecting their anonymity. You're just saying they're going about it in two too careful of a of a of a process.  And that's exactly what the court found. The court said, yes, this is a legitimate, penological interest, took it very seriously and then said. But is that and is that do you agree that that is reviewed under a rational basis review? It's under the Turner standard, which I think your honor is rationally related to. Well, I thought I mean, Turner is not just a rational basis test because it has four prongs. Right. Of which the first, I think, is actually an unseated as reasonable and rather than rational. I'm not sure about that, but if that makes a difference. But it's. A reticulated version. And I think that's in particular what in counter on the remand was on the exaggerated part of it. And that was what Woodford was writing about. And that's what Otter, it seems to me, which is probably the closest in case applied. Yeah, I agree, your honor, and that's exactly why when you go through the Turner factors, the first step is this. And I think you're right, it's reasonably related to legitimate, penological interest. And you don't seem to really be questioning that part of it, or maybe you are. You're saying this particular process isn't reasonable. What I'm saying is that it is a legitimate, penological interest to maintain the anonymity and the safety of the medical team members. And the district court, Judge Grasham, did that as well. So then the next part of it is, is it reasonably related or isn't it exaggerated response? And Judge Grasham made findings that it was an exaggerated response. And she did that by looking at this circuit's opinion in Woodford, this circuit's opinion in Otter, and the fact that there was nothing on the record before her different from the state than had been in front of the Ninth Circuit in Otter. And the Ninth Circuit in Otter very much took the state to task, asked her in oral argument, tell us why you need these things. Offered to let them bring forth evidence, tell us now here in oral argument. They couldn't do that at all. And here we are 13 and a half years later, and it's the same bare bones argument. There was evidence in the record about whether or not the processes that they already followed did meet their legitimate, penological interest. They already have on medical garb. So that was a step that they had taken, and it had worked. Ms. Boone testified that she had never, not testified, Ms. Boone said in her declaration that she had never, in the three executions that she had witnessed, she had never been able to tell who was on the medical team. And in the First Amendment Coalition case, there wasn't, what this has come down to, as I understand it, is restricting the sound, that they don't want to be able to hear the voice. And that's exactly what FACA was about, right? Because they wanted to turn off the sound. And the holding there was that they couldn't restrict access to the sounds of the execution when it was part of the execution. So that's essentially what they're trying to do here. I think that's the concern that they have, is they wouldn't want people to hear that sound. And so I think, Your Honor, yes, they're saying there's a part of this that we don't want you to see or hear because people might have to talk. And are you disagreeing with that aspect of it? I mean, are you just, are you, would you, I guess I need to go back and look at the language. But if it was just the camera and no sound, are you saying, no, we need the sound as well? Yes, because I think that would be directly in violation of Ryan, which is an earlier decision of this Court from. I'm calling that, that's the First Amendment Coalition case, and it says that the historical tradition of public access described in Woodford includes the ability to hear the sounds of executions. But and I also think, Your Honor, that when we talk about the entirety of the executions. I mean, but I really think this comes down to the fourth prong of Turner, because, you know, with the first prong, it's whether there's a valid, rational connection between the prison regulation, legitimate governmental interest put forward to justify it. There's certainly a rational connection between having the medical team in a separate room for anonymity purposes. But your real argument is that there's other ways to do it. And the standard there is, if you can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, the court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. But one of their arguments is that the audio will reveal who the people are. So that doesn't fully accommodate the interest. What's your response to that? Well, Your Honor, I would say the response to that is the California First, or excuse me, I think it's the First Amendment Coalition versus Ryan case, where it was, I think, very clear. But you just think our precedent forecloses that. Correct, Your Honor. But did that deal with the voices of persons who were the actual initiators of the process? I thought the focus was on the voice of the condemned. Or anyone who was speaking in the execution chamber, Your Honor. But you have that. What you don't have is the potential voices of people who are pushing the plunger. And Your Honor, I would submit that that part of what would go on in the medical team room would absolutely be critical to the proper understanding or the proper functioning of the execution procedures. And Ryan directly addressed that. So to the extent that the execution team members could be identified by the sound of their voices, so witnesses could already hear their voices during the initial stages of the execution. I guess that's not necessarily true here, but they could see them during the initial stages of the execution. So, go ahead. I mean, so you agree, well, let me ask you this question. Do you agree hearing their voices is different than seeing them in scrubs as far as the potential to identify them? Absolutely, Your Honor. There are lots of ways to identify people and voice has long been a way to identify people. I think given that the medical team members may also be speaking in the preparation room and the likelihood of anyone who is a witness being familiar enough with the voices to hear it in such a small snippets, I think it's exceptionally unlikely that that would provide any greater identification than is already made available when they're in the execution room. But the state has said we're worried about it. So what, I mean, is there any way, maybe from your perspective there's not, is there any way to alleviate this in a way that would, I mean, if sound were just shut off, you're saying you would disagree with that. You think that that's inconsistent with Ryan. It can't be ordered that way. I mean, here's the problem with Ryan. The reason why we rejected anonymity in Ryan as a justification for turning off the sound is that to the extent that execution team members could be identified by the sound of their voices, witnesses can already hear their voices during the initial stages of the execution. But this is set up so that that's not true. So Ryan is not controlling on this case, it seems to me. Well, your honor, I may have misunderstood my colleague in the record. But my understanding is that the people in the medical team room are some of the same people who are in the execution preparation room. So a way they could handle that certainly would be to only- They can't speak in the other room. I don't know, it seems a little weird, I don't know how they would do that, but they could speak low. So I simply don't think that they, and it sounds like if they speak in the medical team room, the things they would be speaking about would be precisely the events in a execution that witnesses would need to be able to see. Well, I'm not sure there's a lot of disagreement about that. The question is, does the penological interest overrule that? And what we're hearing is that they have a reasonable belief that those voices should be protected. You're saying, no, they shouldn't be protected because that's important information. But if, I mean, that also is, I mean, maybe what we need is a separate transcript. Maybe this is your proposal, is there's a separate transcription in, I mean, AI can do crazy things these days. So, you know, there's a separate transcription that, you know, says what they're saying, but doesn't give their voice. But that hasn't been proposed, I take it. Yeah, I think the, I think, Your Honor, there are lots of things that the state could do, probably, to provide meaningful access. Require you to come forward with those alternatives that would meet the, the, the penological interests. Well, Your Honor, I would, but for the fact that these interests had already been rejected, that would probably be the case. And also, as the only evidence in the record before Judge Grasham, and so I think it's not an erroneous finding in fact, is that people who have been witnesses, or a person, Ms. Boone. That were not identified in the past.  Okay. And, Your Honor, I'm over time, but. Can I, or, yep, thank you. All right, I appreciate it, Your Honor, thank you. Let me just, we asked you to write these briefs about the new protocol. And I gather there's agreement between the parties that there's not mootness because it's possible that there will be. Yes, I think both of our supplemental briefs said that the matter is not, is not moot. We had suggested that the court stay its decision here. Frankly, we were anticipating that the state would take a different, different position. And that's, I guess, one of the challenges of simultaneous briefing. But we're not asking for that anymore. But thank you, Your Honor. Okay, thank you. Thank you very much for your argument. We'll give you two minutes for rebuttal. Or did she have more than two minutes? I didn't mean to cut her. Oh, no, she was over before you. Thank you. Specifically addressing, I believe, questions by Judges Berzon and Collins. They specifically were talking about Ryan. And in looking at Ryan, the issue- Do they, do the members who push the plunger in the medical room, do they speak at any point in the execution chamber in an earlier part of the process? No, Your Honor. So the only individual-  Say that one way if there's anything in the record on that point. No, I don't believe it is in the record, Your Honor, because we were not at a stage in this litigation where the defendants bore the burden. If the audio requirement were taken away from the district court's injunction, wouldn't that then now under Turner Factor 4 fully accommodate your anonymity concern? Because then you just have the same interest. They wear the scrubs. They're seen at different points. And it seems to fully satisfy. So I don't see how you're getting the visual part out. The audio may be different. Not to belabor, obviously, the defendant's position on the extent of Woodford, but to the extent that the court is asking, would that satisfy the anonymity concern? It would. With respect to that other issue of what- Do you then have a further interest that would justify a restriction? Beyond anonymity? Or is that, you're done at that point? The issues with respect to conflict and issues raised by sound in the medical team room are the primary concerns. It has to do with anonymity, but it also has to do with interference, with audible sounds coming from the chemical room, from the medical team room, and with audible sounds of the condemned in the chamber. There are some very grave concerns about whether or not the condemned would be able to be modified and monitored if sound from the medical team room- Since you don't do it, we don't know. But did the injunction require that there be a microphone? It required audio access, right? Because of Ryan, presumably. I would presume so. I just want to make sure I understood. You were saying that if we took out the audio portion, you'd be satisfied with the injunction as is. Well, largely satisfied. Satisfied enough to drop your appeal? We would be satisfied if the court were to determine that the injunction needs to be modified. The defendants submit that it's not necessary and that it should be vacated for all of the reasons, meaning that it's not required- My understanding of your position is there's absolutely no access right. And, I mean, are you dropping that position? No, Your Honor. We would submit there's no right- Well, so in answer to my question, you're saying even if we said audio is cut off, you would still be maintaining your challenge because you don't think the video access is warranted under the First Amendment? Correct, but it's not- But I'm trying to understand. I understand you're saying there isn't a right of access at all, period, full stop. But if we get past that and we say there is a right of access, and now we have to look at interests under the Turner analysis, we've already now settled that the anonymity issue is fully accommodated if the audio is removed and the video is left in place. Do you then, under the Turner analysis, have another interest that will justify blocking the video, assuming we think that there's otherwise a threshold right of access? Do you see where I'm getting at? If we're past that no access, no extension of Woodford, and now we're just doing the Turner v. Sackler-  Then- Do you have anything other than anonymity that will knock out the video aspect in your view? As long as the video is, again, it must be very pointed and directed. So if it's a broad view- Which you don't think is permissible, but we tend to have a different view. And I gather you're dropping the notion that there's a cost problem. Well, currently, right now, the F block is under renovation, and so I'm not sure, and I don't think that the department has a cost analysis because we're having to renovate because of the change to execution methods. So I don't, at this point, think that that is a point that the department has evidence on. The configuration is going to have to accommodate both methods? It will, Your Honor. But I still, I want to make sure I get your answer to this question before we leave, which is, is there another interest in the Turner analysis, assuming you've lost everything else and we're down to Turner, is there an interest you assert that you think will block the video access? The video access to the entirety of the room, yes, for all of the reasons set forth- Right, but I already read the language, and I think it's pretty clear. It gives you the ability to direct the camera to capture the activity that is the subject of the injunction and exclude other things. Then on the court's very limited question, then no, there are no other penological interests when it is that very targeted video. The department doesn't have any further- We've made some progress today. We thank you. Thank you both very much. Seriously, thank you. This is a very important case. We appreciate the importance of it, and we very much appreciate the professionalism in the courtroom today. With that, the case is submitted, and we will take yet another short recess before we come back to hear our fourth and final case.
judges: BERZON, NELSON, COLLINS